Marc Toberoff (MT 4862)
LAW OFFICES OF MARC TOBEROFF, PLC
Attorneys for Plaintiffs
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
Tel: 310-246-3333

Laurence Singer (*pro hac vice*)
1717 K Street, Suite 600
Washington, DC 20036
Tel. (646) 327-8772

Attorneys for Plaintiffs Clonus Associates and
Robert Fiveson d.b.a. Fiveson Productions

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CLONUS ASSOCIATES and ROBERT S.
FIVESON d.b.a. FIVESON PRODUCTIONS

     Plaintiffs

     v.

DREAMWORKS, LLC and
WARNER BROS. ENTERTAINMENT, INC.

     Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Case No. 05 CV 7043 (SAS)

[Hon. Shira A. Scheindlin]

[Electronically filed]

# MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION.................................................................................1

MATERIAL.....................................................................................2

ARGUMENT....................................................................................2

    I.    The Legal Standard.................................................................2

        A.    Summary Judgment.................................................2

        B.    Copyright Infringement.............................................3

    II.    Defendants' Fail To Negate Copying As A Matter Of Law; Their Motion
Is Rife With Material Issues Of Fact.........................................3

        A.    Plaintiffs Have The Right To Test The Credibility Of Defendants'
Highly Interested Witnesses Live, In Open Court, Before A
Jury..............................................................4

        B.    Plaintiffs Show A Reasonable Possibility Of Access; In Any
Event, Defendants' Access Is A Material Issue Of Fact....................7

            1.    Plaintiffs Raise A Triable Issue Of Fact As To A "Link"............9

            2.    Plaintiffs Raise A Triable Issue Of Fact As To "Wide
Dissemination"............................................10

        C.    The Abundant Probative Similarities Between The Films Raise
A Triable Issue Of Fact As To Copying.....................................12

    III.    Defendants' Copying Of Clonus Is Unlawful Pursuant To Circuit's
"Ordinary Observer" Test And, At A Minimum, Presents A Triable Issue
For The Jury.................................................................15

        A.    Plaintiffs' Case Rests On Protectible Expression, Not
Generalized Ideas.................................................20

        B.    Defendants' Copy Far More Than Mere Scenes A Faire....................23

        C.    The Films' Plots, Characters, Settings, Themes, Dialogue,
Details, Mood, Pace, Sequencing And Interplay Of Elements Are
Substantially Similar.................................................24

    IV.    DEFENDANTS' PROFITS ARE AN ISSUE OF TRIABLE FACT.................25

CONCLUSION..................................................................................25

i

## **TABLE OF AUTHORITIES**

**FEDERAL CASES**                                                       **PAGE**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)....................................................................3

*Arica Inst., Inc. v. Palmer,*
    970 F.2d 1067 (2d Cir. 1992)...........................................................15-16

*Arnstein v. Porter,*
    154 F.2d 464 (2d Cir. 1946).............................................................4

*Bevan v. Columbia Broadcasting System, Inc.,*
    329 F. Supp. 601 (SDNY 1971)........................................................8

*Boisson v. Banian, Ltt.,*
    273 F.3d 262 (2d Cir. 2001)........................................................6, 8, 15

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
    683 F.2d 610 (2d Cir. 1983)...........................................................20

*Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.,*
    150 F.3d 132 (2d Cir. 1998)............................................................3

*CBS Broad. Inc. v. ABC,*
    2003 U.S. Dist. LEXIS 20258 (SDNY 2003).......................................7-8, 13, 15

*Consarc v. Marine Mid. Bank,*
    996 F.2d 568 (2d Cir. 1993)............................................................3

*D'Amico v. City of New York,*
    132 F.3d 145 (2d Cir. 1998)............................................................3

*Denker v. Uhry,*
    820 F. Supp. 722 (SDNY 1998)........................................................13

*Dimmie v. Carey,*
    88 F. Supp. 2d 142 (SDNY 2000).....................................................7, 10

*Donahue v. Windsor Locks Bd. of Fire Comm'rs,*
    834 F.2d 54 (2d Cir. 1987).............................................................3

*Eckes v. Card Prices Update,*
    736 F.2d 859 (2d Cir. 1984)...........................................................12

*Ellis v. Diffie,*
    177 F.3d 503 (6th Cir. 1999)..........................................................10

*Feist Publications v. Rural Tel. Service Co.,*
    499 U.S. 340 (1991)...............................................................................3, 15-16

*Fisher Price, Inc., v. Well Made Toy Manu. Corp.,*
    25 F.3d 119 (2d Cir. 1994)...................................................................13-14

*Folio Impressions, Inc. v. Byer Cal.,*
    937 F.2d 759 (2d Cir. 1991)......................................................................15

*Gaste v. Kaiserman,*
    863 F.2d 1061 (2d Cir. 1988)...........................................................3, 8, 10

*Green v. Lindsey,*
    1992 WL 373124 (SDNY 1992).................................................................12

*Gund, Inc. v. Applause, Inc.,*
    809 F.Supp. 304 (SDNY 1993)..................................................................15

*Gund, Inc. v. Russ Berrie & Co.,*
    701 F.Supp.1013 (SDNY 1988)..................................................................15

*Hamil Am., Inc. v. GFI,*
    193 F.3d 92 (2d Cir. 1999)...............................................................14-16, 25

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
    471 U.S. 539 (1985)..................................................................................16

*Hogan v. DC Comics,*
    48 F. Supp. 2d 298 (SDNY 1999)...........................................10, 12-13, 16, 20

*Ideal Toy Corp. v. Fab-Lu, Ltd.,*
    360 F.2d 1021 (2d Cir. 1966).....................................................................15

*In Design v. K-Mart Apparel Corp.,*
    13 F.3d 559 (2d Cir. 1994)........................................................................25

*Intersong-USA v. CBS, Inc.,*
    757 F. Supp. 274 (SDNY 1991)....................................................................7

*Johnson v. Gordon,*
    409 F.3d 12 (1st Cir. 2005).......................................................................14

*Jorgensen v. Epic/Sony Records,*
    351 F.3d 46 (2d Cir. 2003).....................................................................8-10

*Knitwaves, Inc. v. Lollytags Ltd.,*
    71 F.3d 996 (2d Cir. 1995)...........................................................6, 15-16, 21

Laureyssens v. Idea Group Inc.,
    964 F. 2d 131 (2d Cir. 1992)................................................................12

Levine v. McDonald's Corp.,
    735 F. Supp. 92 (SDNY 1990)........................................................3, 17

Lipton v. Nature Co.,
    71 F.3d 464 (2d Cir. 1995)........................................................8, 12, 17

Lone Wolfe McQuade Assoc. v. CBS, Inc.,
    961 F. Supp. 587 (S.D.N.Y. 1997).....................................................20

MCA, Inc. v. Wilson,
    425 F. Supp. 443 (SDNY 1976).........................................................17

Mowry v. Viacom Int'l, Inc.,
    75 U.S.P.Q.2D (BNA) 1624 (SDNY 2005)..........................................8

Nichols v. Tufenkian Import/Export Ventures, Inc.,
    367 F. Supp. 514 (SDNY 2005)..........................................................12

Nihon Keizai Simbun, Inc. v. Comline Bus. Data, Inc.,
    166 F.3d 65 (2d Cir. 1999)..................................................................16

Northern Music v. King Record Dist.,
    105 F. Supp. 393 (SDNY 1952)............................................................9

Novak v. NBC,
    752 F. Supp. 164 (SDNY 1990)..........................................................10

Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,
    558 F.2d 1090 (2d Cir. 1997).......................................................6-7, 15

Repp v. Webber,
    132 F.3d 882 (2d Cir. 1997)..................................................................8

Rocking Chair Enters., L.L.C. v. Macerich SCG Ltd. P'Ship,
    407 F. Supp. 2d 1263 (W.D. Okla. 2005)...........................................24

Salinger v. Random House, Inc.,
    811 F.2d 90 (2d Cir. 1987)..................................................................16

Sandberg & Sikorski Corp. v. Andin Int'l, Inc.,
    50 U.S.P.Q.2D (BNA) 1699 (SDNY 1999)..........................................4

Silberstein v. Fox Entertainment Group, Inc.,
    2004 WL 1620895 (SDNY 2004)...............................................7, 10-11

*Silverstein v. Penguin Putnam, Inc.*,
　　2003 U.S. Dist. LEXIS 5487 (SDNY 2003)...................................................12

*Sofitel, Inc. v. Dragon Med. and Scient. Commns, Inc.*,
　　118 F.3d 955 (2d Cir. 1997).................................................................16

*Streetwise Maps, Inc. v. Vandam, Inc.*,
　　159 F.3d 739 (2d Cir. 1998).................................................................16

*Sylvestre v. Oswald*,
　　1993 U.S. Dist. Lexis 7002 (SDNY 1993)...................................................7

*Tisi v. Patrick*,
　　97 F. Supp. 2d 539 (SDNY 2000)........................................................7, 10

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
　　715 F.2d 1327 (9th Cir. 1983)..............................................................20

*Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.*,
　　996 F.2d 1366 (2d Cir. 1993)...............................................................17

*Walker v. Time Life Films, Inc.*,
　　784 F.2d 44 (2d Cir. 1986)..................................................................16

## FEDERAL RULES

Fed. R. Civ. P. 56(c)............................................................................3

## MISCELLANEOUS

Latman, *"Probative Similarity" as Proof of Copying: Toward Dispelling Some
　　Myths in Copyright Infringement*, 90 Colum.L.Rev. 1187 (1990).......................4, 12

3-13 *Nimmer On Copyright* § 13.02...........................................................8

4-13 *Nimmer On Copyright* § 13.03...........................................................17

## **INTRODUCTION**

Plaintiff Robert Fiveson ("Fiveson") produced and directed an independent feature film titled "Parts: The Clonus Horror" ("CLONUS"), first released in 1979. Produced on a tight budget of only $257,000, the film had a memorable story twist or "hook." The childlike lives of the inhabitants of a seemingly utopian but regimented colony are dominated by the indoctrinated myth of a remote paradise called "America" for which they yearn to be chosen. One such inhabitant, distinguished from the others by his impatient curiosity, learns the awful truth -- they are but human clones, serving as spare parts banks for members of the social elite. To be "special," to be chosen for "America," is a one way ticket to the operating table. He daringly escapes to confront his existence and human counterpart in the real world.

In 2004, Defendants DreamWorks, LLC and Warner Bros. Entertainment, Inc. ("Defendants") produced and directed a Studio blockbuster entitled "The Island" ("THE ISLAND") with a reported budget of $126 million. Its release in 2005 was met with a spontaneous public outcry from numerous film critics and a multitude of ordinary audience members, recognizing the film as an "un-credited remake," "a rip-off," "a clone" of CLONUS.

Incredibly, THE ISLAND is strikingly similar, if not the same, as CLONUS, except the name of the indoctrinated mythic paradise has changed from "America" to "The Island." Not only is this unusual "hook" identical, but most of the plot, characters, structure, sequencing, pace, themes and settings are the same. Many "shots" are even the same. THE ISLAND even includes by rote story flaws in CLONUS. With so many options for creative and dramatic choices regarding a film about cloning and Defendants' unlimited storytelling resources it is inconceivable that their strikingly similar film was created independently of CLONUS. Given the very different eras in which the films were made and the enormous disparity in the films' budgets, the striking similarities are all the more telling. If you strip away THE ISLAND'S gratuitous big budget action sequences, gadgetry and elaborate set designs you have CLONUS.

A pair of eyes and common sense reveals that the "total concept and feel" of both films are unmistakably and strikingly similar. No reasonable juror, properly instructed, could find

otherwise. Plaintiffs thus moved for summary judgment ("SJM") based on well settled law.

The striking similarities between the subject films remain largely undisputed by Defendants which instead incorrectly focus of the film's negligible differences. Because Defendants' access and copying are inferable from *striking similarities* as a matter of law, Plaintiffs' SJM does not raise genuine issues of material fact. The converse, however, is not true. If the Court finds Plaintiffs do not meet the higher hurdle of *striking* similarity, triable issues of fact remain as to Defendants' copying ("reasonable possibility of access" and probative similarity) and infringement (*substantial* similarity) under the "ordinary observer" test for which Plaintiffs supply ample evidence. For purposes of Defendants' summary judgment motion ("Motion" or "Mot.") such evidence is to be viewed in the light most favorable to Plaintiffs as the non-movant. Under such circumstances, their Motion is disfavored and cannot succeed.

Defendants' Motion, based largely on the *credibility* of highly interested witnesses, is riddled with triable issues of material fact. Plaintiffs have the invaluable right to cross-examine Defendants' witnesses in the presence of a jury. It is likewise necessary for the Court to hear Defendants' disputed key testimony live. On the issue of copying vs. independent creation the dubious credibility of the Defendants must be tested in open court.

## MATERIAL

Plaintiffs rely herein, without limitation, on the films at issue before the Court; the opposition declarations of Marc Toberoff, Robert Fiveson, and Nicholas Williamson (respectively, Tob. Opp. Dec., Fiveson Opp. Dec., Will. Opp. Dec.) and exhibits thereto; the declarations of Robert Sullivan and Lew Hunter (respectively, Sullivan Dec. and Hunter Dec.) and exhibits thereto in support of Plaintiffs' motion for summary, by consent of the parties; and a *revised* detailed comparative matrix of 102 similarities between the subject films (Tob. Opp. Dec., Ex. E, hereinafter, *Comparative Matrix*).

## ARGUMENT

## I.     THE LEGAL STANDARD

### A.     Summary Judgment

A motion for summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The "'fundamental maxim' [on summary judgment] is that the 'court cannot try issues of fact;' it can only determine whether there are issues to be tried." *Levine v. McDonald's Corp.,* 735 F. Supp. 92, 95 (SDNY 1990) quoting *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir. 1987). A fact is "material" if it affects the outcome of the suit under the governing substantive law. *Consarc v. Marine Mid. Bank,* 996 F.2d 568, 572 (2d Cir. 1993), *citing Liberty*, 477 U.S. at 248. The moving party bears the burden of identifying evidence that demonstrates the absence of a genuine issue of material fact for trial. *Liberty*, 477 U.S at 256.

In determining if summary judgment is appropriate, the court resolves all ambiguities and draws all reasonable inferences against the moving party. *See D'Amico v. City of New York*, 132 F.3d 145, 148 (2d Cir. 1998), *cert. denied*, 141 L. Ed.2d 151, 118 S. Ct. 2075 (1998).

### B.     Copyright Infringement

To prevail on their copyright infringement claim, Plaintiffs must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications v. Rural Tel. Service Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282 (1991). As direct evidence of copying is seldom available, a plaintiff may prove copying indirectly by showing "probative similarity," a reasonable possibility of access, and unlawful appropriation pursuant to an "ordinary observer" test. *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998); *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988).

Defendants do not contest in their Motion the validity of Plaintiffs' copyright in CLONUS. At issue is Defendants' copying of CLONUS in THE ISLAND.

## II.    DEFENDANTS' FAIL TO NEGATE COPYING AS A MATTER OF LAW; THEIR MOTION IS RIFE WITH MATERIAL ISSUES OF FACT

3

**A.**  **Plaintiffs Have The Right To Test The Credibility Of Defendants' Highly Interested Witnesses Live, In Open Court, Before A Jury.**

The defendant's denial of copying and assertion of independent creation is commonplace in copyright infringement cases and requires "the invaluable privilege of cross-examining the defendant -- the 'crucial test of credibility' -- in the presence of the jury rather than by deposition." *Arnstein v. Porter*, 154 F.2d 464, 469-70 (2d Cir. 1946) (citations omitted); *Sandberg & Sikorski Corp. v. Andin Int'l, Inc.*, 50 U.S.P.Q.2D (BNA) 1699, *8 (SDNY 1999) ("in order to decide whether [the] defense has merit, it will be necessary for the Court to hear the live (and disputed) testimony of [defendant's witness], which forms the heart of that defense"). "Accordingly, on the issue of copying the credibility of the defendant ha[s] to be tested in open court, rather than on summary judgment." Latman, *"Probative Similarity" as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement,* 90 Colum.L. Rev. 1187, 1193 (1990).

Defendants' Motion relies heavily on the deposition testimony of highly interested witnesses, THE ISLAND'S screenwriters, Caspian Tredwell Owen ("Owen"), Alex Kurtzman ("Kurtzman") and Robert Orci ("Orci") and its director, Michael Bay ("Bay"), who claim they independently created THE ISLAND.[1]  Defendants' Motion thereby seeds its own demise by relying on the credibility of interested witnesses to be weighed by a jury at trial. *Liberty,* 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

The livelihood of each of Defendants' witnesses is dependent on the six major motion picture Studios dominating Hollywood (Universal, Sony (Columbia), Paramount, Twentieth Century Fox and Defendants' Warner Bros. and DreamWorks (owned by Paramount)).  Further, Bay, Kurtzman and Orci are currently on DreamWorks' payroll as the director and screenwriters, respectively, of the upcoming Dreamworks' film, "The Transformers" (2007).  (Kurtzman Tr.

---

[1] Attached as Exhibits A through C to the Tob. Opp. Dec., respectively, are relevant excerpted pages from the deposition transcripts of Owen, Kurtzman, Orci, and Bay, hereinafter respectively cited parenthetically as "(Owen Tr.__; Kurtzman Tr. __; Orci Tr. __; and Bay Tr. __)."

15:15; Orci Tr. 34:22-23; Bay Tr. 8:10-11; Owen Tr. 14:2-25).

Owen's deposition testimony (like his prior declaration) smacks of the reverse engineering typical of defendants in infringement actions, wherein every aspect of his "spec screenplay" for THE ISLAND is tied to some ultra-personal event, emotion or intellectualization. (Owen Tr. 169:18-171:8). It all fits far too neatly. In any event, Owen's emotive experiences and his copying of CLONUS alleged herein are not mutually exclusive and would just as well explain why Owen was attracted to the premise, themes and plot of CLONUS. Moreover, it is natural, if not *de rigeur*, for a writer to internalize a work he is *adapting* based on his personal experiences as expressed by Owen.

Bay, on the other hand, personally took credit in his deposition for a majority of the similarities in THE ISLAND, though he has no writing credit on the Film -- even those present in Owen's spec script where Bay had no input (e.g., holographic fight scene claimed by Bay (Bay Tr. 25:13-18), present in detail on pages 8-9 of Owen's original script (Tob. Opp. Dec., Ex. A).

Owen and Orci each testified that it was their customary practice before embarking on a new screenplay to conduct extensive research on the Internet as to the subject matter. (Owen Tr. 63:17-21; Orci Tr. 79:1-12). Owen and Orci each explained that they customarily go to *Google* and type in the subject. (Owen Tr. 71:19-72:13; Orci Tr. 79:1-12). When asked if he researched prior films on a subject Owen answered in the affirmative but qualified his answer by only documentaries. (Owen Tr. 70:1-12). Bay described how his staff regularly engages in similar research and how in preparing for THE ISLAND he went so far as to hold specially arranged meetings with Microsoft to enable him to get a better idea "about the future." (Bay Tr. 18:19-25).

In addition, it is reasonably inferred that DreamWorks' script development and production executives (plus support staff), with whom Owen, Kurtzman & Orci and Bay worked, also engaged in research concerning the THE ISLAND. It can also be inferred that other branches of DreamWorks and Warner Bros. (e.g., the marketing and distribution departments) routinely engage in research into prior films on the same subject to analyze their financial performance, distribution patterns and marketing campaigns. Yet, with all this dedicated

research and resources available to them, Defendants' witnesses and relevant film departments purportedly never even heard of CLONUS -- a "cult classic" with nearly identical plot, themes, characters and structure as their film.[2]  No reasonable juror would find this credible.

If one goes to *Google* or *imdb.com* and types in "cloning" it is not long before CLONUS and a description of its plot pops up.  (Tob. Opp. Dec., ¶ 7, Ex. D).  If one goes to *Google* and types in "cloning films" or "cloning movies" one is immediately referred to Web pages that include CLONUS and its plot.  *Id.*  If one goes to *Google, eBay* or *Amazon.com* and types in "Clonus Horror," multiple VHS copies are readily available.

Defendants' mantra that the deposition testimony of their highly interested witnesses is "uncontroverted evidence" of independent creation (Mot. at 2, 3, 11, 13) contradicts the films before the Court, Plaintiffs' *Comparative Matrix* and well settled law governing infringement analysis.  Plaintiffs need not produce a "smoking gun" to refute such self-serving testimony.  As set forth above, Plaintiffs can prove copying *indirectly*.  *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 (2d Cir. 1997).

Defendants provide no evidence of purported independent creation other than predictable testimony fraught with reverse engineering.  Defendants break THE ISLAND up into a few parts and then refer to a random news report on cloning (Mot., at 3, fn 1) or to a screenwriter's personal experiences (e.g., "the 'Jordan' character…was inspired partly by a women Owen had been dating 'and partly a kind of ideal girlfriend' (Owen Tr. 168:21-25)") (Mot. at 4).  Such approach to well developed copyright law is facile and unpersuasive.  Defendants' selective *dissection* of the subject films is disfavored.  *See Boisson v. Banian, Ltt.,* 273 F.3d 262, 272-273 (2d Cir. 2001);  *Knitwaves, Inc. v. Lollytags Ltd.,* 71 F.3d 996, 1003 (2d Cir. 1995).

Plaintiffs' evidence of probative similarity, in any event, stands firm. The contested explanations provided by Defendants as purported evidence of independent creation, relate to

---

[2] Incredibly, each witness dubiously insisted that after learning of the public's reaction to THE ISLAND as a "rip-off" of CLONUS, he had no interest in viewing CLONUS. Owen's demeanor was remarkably agitated and defensive throughout his deposition.

only 24 of the 102 similarities listed by Plaintiffs and, in almost every case, Defendants' anecdotes only partially explain the similarity addressed. *See Comparative Matrix*. Nothing in Defendants' independent creation argument explains or can explain the parallel sequencing of *so many* similar elements in the subject films. *See Comparative Matrix* where similarities are generally in sequence and, in particular, *see* Nos. 1-3, 6, 10-14, 19, 21, 30-32, 35, 37, 40-43, 46-48, 59, 60-72, 76-81, 83, 90, 99-101. It is impossible to imagine how so many choices are so strikingly similar in both films other than by copying.

By contrast, in every case cited by Defendants regarding independent creation, the probative similarities were tenuous and sparse, and the defendant furnished extremely convincing un-rebutted evidence of independent creation.[3]

Defendants' cannot demonstrate independent creation on summary judgment because their evidence is insufficient and, in any event, contested. In addition, unlike the formulaic works involved in Defendants' authority, Plaintiffs' allegations regarding the sequencing of over 100 elements in both motion pictures requires factual analysis by the court.

**B.    Plaintiffs Show A Reasonable Possibility Of Access; In Any Event, Defendants' Access Is A Material Issue Of Fact**

Because defendants are rarely caught red-handed, the plaintiff in a copyright infringement action need only show "a reasonable possibility of access." *Novelty Textile*, 558 F.2d at 1092; *Sylvestre v. Oswald*, 1993 WL 179101, *3 (SDNY 1993). Plaintiffs must show

---

[3] Defendants cite *Dimmie v. Carey*, 88 F. Supp. 2d 142, 144, 146, 151 (SDNY 2000) ("documentary evidence" of working tapes and song journal held "extremely convincing" in prior infringement suit; plaintiff offered not a "scintilla of evidence" of access, nor probative similarities, nor expert testimony.); *CBS Broad. Inc. v. ABC*, 2003 U.S. Dist. LEXIS 20258, *11 (SDNY 2003) (only arrangement of subject reality TV programs protectable, and no such similarity existed); *Tisi v. Patrick*, 97 F. Supp. 2d 539, 549 (SDNY 2000) ("two songs share nothing in common aside from the use of basic pop and rock musical devices, which are common to many, many songs"); *Silberstein v. Fox Entertainment Group, Inc.*, 2004 WL 1620895, *8, *10 (SDNY 2004) (independent creation supported by "copious undisputed testimonial and documentary evidence" and "virtually nothing similar about the two characters"); *Intersong-USA v. CBS, Inc.*, 757 F. Supp. 274, 282 (SDNY 1991) (song's independent creation proved; few common elements "ordinary, unprotectable expression").

only that Defendants had a reasonable *opportunity* to see their film.  *Id.*; *see also Bevan v. Columbia Broadcasting System, Inc.*, 329 F. Supp. 601, 604 (SDNY 1971).

The numerous probative similarities present in THE ISLAND, in themselves, raise a triable issue as to access.  "There is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 56 (2d Cir. 2003).  "A more common circumstance requiring no independent proof of access occurs when the similarity between Plaintiffs' and defendant's works is sufficiently striking..."  3-13 *Nimmer On Copyright* § 13.02; *see Repp v. Webber,* 132 F.3d 882, 889 (2d Cir. 1997); *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995); *Gaste,* 863 F.2d at 1068.  Here, the striking similarities between the subject films may well prove access as a matter of law, but, in any case, constitutes strong evidence of access, raising a triable issue of fact.  Such evidence is not defeated on summary judgment based on the denials of Defendants' interested witnesses.

In this respect, Premiere Magazine's critique of THE ISLAND was indeed prescient:

> "[T]he first hour of *The Island* plays like a much more expensive albeit scene-for-scene remake [of *Parts: The Clonus Horror*].  How this picture went through all of its phases of development and production without a single human being pointing out the rather uncanny plot similarities between the two pictures is something that, thanks to the good graces no doubt of the legal departments at Warner's and Dreamworks, we shall surely never, ever learn." *Premiere Magazine, Premiere.com, July 22, 2005.*  (Will. Opp. Dec., Ex. B).

Additionally, a "reasonable possibility of access" may be established by showing a "particular chain of events or 'link' by which the alleged infringer might have gained access to the work" or wide dissemination of the infringed work.  *Boisson,* 273 F.3d at 270; *CBS Broadcasting*, 2003 U.S. Dist. LEXIS 20258, *2-3.

It is noteworthy that in the rare cases where "access" is refuted as a matter of law, including those cited by Defendants, the alleged infringed work, unlike CLONUS, was *unpublished*, requiring plaintiff to show some direct "link" between the subject works.[4]  It is

---

[4] Defendants' rely heavily on *Mowry v. Viacom Int'l, Inc.*, 75 U.S.P.Q.2D (BNA) 1624, *10-11 (SDNY 2005), where plaintiff failed to allege delivery of his unpublished work to anyone who

clearly easier to show "a reasonable possibility of access" to a published work like CLONUS. *See Northern Music v. King Record Dist..,* 105 F. Supp. 393, 398 (SDNY 1952) ("Priority of publishing in itself raises a presumption that Defendant had contact [access].").

### 1.    Plaintiffs Raise A Triable Issue Of Fact As To A "Link"

Plaintiffs have presented evidence that Steven Spielberg ("Spielberg") received a VHS copy of CLONUS in 1998 before DreamWorks embarked on THE ISLAND.  On December 8, 1998, CLONUS' screenwriter, Robert Sullivan, wrote to Spielberg enclosing a VHS copy of CLONUS. *See* Declaration of Robert Sullivan in Support of SJM, ¶ 5, Ex. A.  Spielberg is a founding partner of Dreamworks, in charge of its film division, and was closely involved in the development of THE ISLAND.[5]  (Owen Tr. 57:24-58:21, 148:16, 152:14; Kurtzman Tr. 46:1; Orci Tr. 100:21; Bay Tr. 58:18-25).

In addition, Fiveson, the director of CLONUS, has consistently declared and testified that on or about March 1, 1979, Jeffrey Katzenberg ("Katzenberg"), then a Paramount executive, now a principal, with Spielberg, of DreamWorks, screened CLONUS as a potential acquisition. After the screening, Katzenberg spoke with Fiveson and indicated that if he was able to make CLONUS for under $1 million, Katzenberg would like to see what he could do with $10 million.  (Fiveson Opp. Dec., ¶ 17-19).  Although, the issue remains as to whether Katzenberg was involved in THE ISLAND, it is reasonable that Katzenberg, as one of only three principals of DreamWorks, communicated frequently with Spielberg who is also "linked" to CLONUS.

Plaintiffs have thus demonstrated two "link[s] by which [Dreamworks] might have

---

"worked for or had any connection to defendants." *Id.* at *15, *citing Jorgensen,* 351 F.3d at 51 (plaintiff "must offer evidence to show that [his] version of the events is not wholly fanciful").

[5] Spielberg is also clearly a science fiction buff: *Close Encounters of the Third Kind* (1977); *E.T. the Extra Terrestrial* (1982); *Twilight Zone: The Movie* (1983); *Jurassic Park* (1993); *Artificial Intelligence: AI* (2001); *Minority Report* (2002); *War of the Worlds* (2005); *Poltergeist* (1982) (producer); *Innerspace* (1987) (executive producer); *The Land Before Time* (1988) (executive producer); *Back to the Future II* (1989) (executive producer); *Arachnophobia* (1990) (executive producer); *Men In Black* (1997) (executive producer); *Men In Black II* (2002) (executive producer); *When Worlds Collide* (2006) (producer). (Tob. Opp. Dec., ¶ 10).

gained access to [CLONUS]." *Gaste*, 863 F.2d at 1067. Such evidence, viewed on summary judgment in the light most favorable to Plaintiffs, is sufficient to show "a reasonable possibility" of access to CLONUS and, thus, place this issue in dispute. *See Hogan v. DC Comics*, 48 F. Supp. 2d 298, 308 (SDNY 1999).[6]

### 2.     Plaintiffs Raise A Triable Issue Of Fact As To "Wide Dissemination"

CLONUS is a known film, having been distributed theatrically and on home video, and having aired repeatedly on network and cable television. CLONUS debuted in theaters on July 18, 1979, distributed by Group 1 Services. (Fiveson Opp. Dec., ¶ 6). After playing in theaters, CLONUS was one of the first movies released in the VHS home video format in the early 1980s and since then has consistently been available on VHS. (Fiveson Opp. Dec., ¶¶ 6, 8, 13). VHS copies of CLONUS have been readily available on the Internet since the late nineties (Fiveson Opp. Dec., ¶¶ 13, 14, Exs. B, D). CLONUS aired twice on CBS, and has repeatedly aired on the SciFi Channel, *Mystery Science Theater 3000*, and national and regional cable channels, including Showtime, HBO, Spectrum, USA, Cablevision and Time Warner Cable. (Fiveson Opp. Dec., ¶¶ 7, 8, Exs. B, C). Owen testified that he was first inspired to write his spec script for THE ISLAND in late December, 2002 while visiting his family in the United Kingdom. (Owen Tr. 123:20-128:8). CLONUS was readily available in the United Kingdom as well, at this time. (Fiveson Opp. Dec. ¶¶ 9, 13, Exs. C, D).

CLONUS became a *Sci-Fi* "cult" classic. In 1979, CLONUS was awarded a "Saturn" for "Best Low Budget Picture" presented by Roger Corman on a nationally televised awards ceremony of *The Academy of Science Fiction Fantasy and Horror*. (Fiveson Opp. Dec., ¶ 5). It has been written up in numerous film guides, on-line movie databases and *Sci-Fi* websites; is

---

[6] The threshold to withstand summary judgment on access is not high. For instance, in *Jorgensen*, 351 F.3d at 56, cited by Defendants for their "bare corporate receipt" argument, the Second Circuit reversed the district court's summary judgment re: access based on a partial admission by defendant resulting in a mere possibility of access to an *unpublished* song. Plaintiffs' evidence of a "link" to Spielberg who *was* creatively involved with THE ISLAND, distinguishes this case from the cases cited by Plaintiffs re: unpublished works where no such evidence was offered or allegation was made -- *Tisi v. Patrick*, 97 F. Supp. 539,549 (SDNY 2000); *Silberstein*, 2004 WL 1620895, *6; *Ellis v. Diffie*, 177 F.3d 503, 506-07 (6th Cir. 1999); *Novak v. NBC*, 752 F. Supp. 164, 168 (SDNY 1990) and *Dimmie*, 88 F. Supp.2d at 146-47.

featured in a best-selling independent production teaching text;[7] was licensed in 1997 for a Learning Channel documentary; and requested for a national exhibit on cloning organized in 2001 by the American Museum of Natural History. (Fiveson Opp. Dec. ¶¶ 4, 18, Ex. A).

CLONUS is easily located on the Internet as one of a number of feature films on cloning, including on *Google* and *IMDB.com* frequented by members of the entertainment industry, including Defendants' witnesses.  (Owen Tr. 18:24) (Tob. Opp. Dec., ¶ 7).

As noted by Defendants (Mot. at 9) wide dissemination is established where, as here, "the allegedly infringed work…is readily available on the market." *Silberstein v. Fox Entertainment Group, Inc.*, 2004 WL 1620895, *7 (SDNY 2004).  During the period wherein THE ISLAND was developed (2002-2005) VHS copies of CLONUS were "readily available" on-line and at video stores, both accessible to those involved in the development and production of THE ISLAND.  (Fiveson Opp. Dec., ¶¶ 13-15).

The public's immediate comparison of THE ISLAND to CLONUS, itself, evidences that CLONUS was in no way obscure and that Defendants shared the same if not greater access to this *Sci-Fi* cult classic.  It is impossible to imagine that all those people who spontaneously reacted to THE ISLAND as a "remake" had seen and remembered CLONUS, yet that those involved with THE ISLAND, including DreamWorks' sophisticated script development and production departments,[8] did not have "a reasonable possibility" of access to CLONUS.

The evidence, viewed in the light most favorable to the non-moving party, is more than sufficient to show "a reasonable possibility" of access to CLONUS and, thus, to place this

---

[7] CLONUS' production history is featured in detail in *The Indie Producer's Handbook* (pp. 7, 18, 21, 82, 96, 97, 125) in publication since 2002.  Currently in bookstores, it has sold thousands of copies and is used by Universities throughout the United States as a definitive reference text for independent production.  (Fiveson Opp. Dec., ¶ 4).

[8] Defendants DreamWorks (e.g., *War of the Worlds* (2005); *Paycheck* (2003); *Minority Report* (2002); *Artificial Intelligence: AI* (2001)) and Warner Bros. (*Sky Captain and the World of Tomorrow* (2004); *The Matrix Revolutions* (2003); *The Matrix Reloaded* (2003); *The Time Machine* (2002); *Artificial Intelligence: AI* (2001); *The Matrix* (1999)) are known for their science fiction films.  Toberoff Opp. Dec., ¶ 9.

material issue in dispute.  *See Hogan*, 48 F. Supp. 2d at 308.

**C.    The Abundant Probative Similarities Between The Films Raise A Triable Issue Of Fact As To Copying**

The striking similarities between CLONUS and THE ISLAND in plot, characters, scenes, details, dialogue, pace, settings, themes, and the sequencing and interplay of these elements cannot be overstated, both quantitatively and qualitatively.  In this respect Plaintiffs furnished the opinion of a highly qualified and well recognized expert who concluded that the films are *strikingly similar*.  Hunter Dec., Ex. B, p.1 ("I find the plot, themes, characters, concept and feel, timing and setting for both movies to be, not only strikingly similar, but strikingly identical.").

A review of the films, and Plaintiffs' *Comparative Matrix* leaves no doubt as to the existence of probative similarities.  The vast number of similarities are persuasive given that the "probative similarity" required to show copying need not be substantial.  *Nichols v. Tufenkian Import/Export Ventures, Inc.,* 367 F.Supp. 514, 522 (SDNY 2005) (cited by Defendants) ("'Probative similarity' is a less demanding test than 'substantial similarity.'"); *Laureyssens v. Idea Group Inc.,* 964 F. 2d 131, 140 (2d Cir. 1992); *Green v. Lindsey,* 1992 WL 373124, *11 (SDNY 1992); Latman, *Probative Similarity, supra.*

THE ISLAND even adopted by rote structural or plotting flaws from CLONUS.  *See Eckes v. Card Prices Update*, 736 F.2d 859, 863 (2d Cir. 1984) ("the existence of common errors in two similar works [are the] strongest evidence of piracy"); *Lipton,* 71 F.3d at 471-472; *Silverstein v. Penguin Putnam, Inc.,* 2003 U.S. Dist. LEXIS 5487, * 21 (SDNY 2003).

For instance, both films confusingly jump into their settings the same way without establishing a sense of time or place.  Similarly, both films abruptly introduce the lead character exasperated and questioning everything, leaving the audience at a loss and wondering if he has been questioning/complaining like this for years.  Both films have the protagonist risking his life and those of others to meet his human double once he escapes, with little motivation, since by that time, he already knows the truth about himself, the institute and "The Island"/"America." THE ISLAND copies CLONUS' thematic detail that the institute dissuades male/female

interaction particularly between the lead characters yet later apparently forgets this key *copied* element and shows both sexes, including the leads, freely associating at a colony bar no less.

Defendants emphasize that THE ISLAND was created by four different people at different times.[9] However, the probative similarities in Owen's spec screenplay alone (before Kurtzman & Orci and Bay became involved) are sufficiently probative of copying.[10]  On the other hand, there is nothing extraordinary about more than one person engaged in copying when they all work for the same company.  It is not incumbent on a plaintiff in a copyright infringement action to figure out who under Defendants' dominion are the culprits or how it came to pass that the infringed work was copied, only that the work was copied by showing probative similarities and a "reasonable possibility of access" to the infringed work.  *Hogan*, 48 F. Supp. 2d at 308-309 ("a determination of substantial similarity requires a detailed examination of the works themselves"); *Denker v. Uhry*, 820 F. Supp. 722, 730 (SDNY 1992) (disregarding evidence of work's genesis; "relevant inquiry is[] a comparison of the works at issue").

Defendants continue to hide behind the weak argument that the probative similarities in THE ISLAND are mere science fiction conventions.  Yet, THE ISLAND's screenwriters each denied employing literary or science fiction conventions in THE ISLAND.  (Owen Tr. 270:11-24, Kurtzman Tr. 142:3-20, Orci Tr. 143:14-24.).

More importantly, Defendants' focus on whether some of the 102 noted similarities are unique expression is misplaced in probative similarity analysis.  "When evaluating probative similarity, a court should compare the works in their entirety, including both protectable and unprotectable elements."  *CBS Broad. Inc.*, 2003 U.S. Dist. LEXIS 20258, *3, *citing Fisher*

---

[9] This is exaggerated. Kurtzman & Orci work as a writing "team" and were brought in by the director, Bay, to revise Owen's script under Bay's oversight, thus, breaking down into two creative groups: (i) Owen, and (ii) Kurtzman, Orci and Bay.  Bay Tr. 78:24-79:25.

[10] Owen's first draft screenplay includes the same set-up, plot, lead characters and sequencing, as CLONUS, including the central "hook" of the indoctrinated mythic paradise. The majority of the similarities set forth in Plaintiffs' *Comparative Matrix* are present in Owen's spec screenplay. (Owen Tr. 187:21-188:7, 199:5-8, 228:5-24).

*Price, Inc., v. Well Made Toy Manu. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994).

Defendants do not because they cannot dispute the uncanny number of similarities between CLONUS and THE ISLAND. *See Comparative Matrix.* Instead, they strain to avoid the obvious probative similarities by deconstructing the subject films into but a few basic elements and searching the entire film lexicon to come up with four films (*Logan's Run, Coma, The Resurrection of Zachary Wheeler*, and *THX 1138*) that each, at best, have one to three elements in common with THE ISLAND. If this were the test virtually no film would be protectible.[11] Moreover, Defendants' comparison of a dozen similarities to elements found here and there amongst prior films does not vitiate the 90 remaining similarities between CLONUS and THE ISLAND. Further, the dozen elements attacked by Defendants only appear interwoven together in CLONUS and THE ISLAND, respectively, not in any of Defendants' examples.

In not one of the films cited by Defendants do the clones themselves believe they are human beings. Not one of the films cited by Defendants is told through the perspective of a lead male clone inhabitant of an isolated, ostensibly utopian, but tightly controlled colony where the lives of its mostly docile, child-like residents are dominated by the indoctrinated myth that they will be chosen to go to a paradise ("America"/"The Island"). Not one of the films cited by Defendants commits itself to this other reality. Most of the films cited are not even about clones. The list goes on and on. *See Comparative Matrix.*

Nowhere do Defendants or their interested witnesses even attempt to explain how *so many* elements in the ISLAND are not only the same as in CLONUS, but *appear in the same order or sequence in both films*. This is never explained because, as informed by common sense, the only explanation *is* copying. *See Hamil Am., Inc. v. GFI*, 193 F.3d 92, 101-02 (2d Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000) (Court guided by "good eyes and common sense").

---

[11] Defendants mis-rely on *Johnson v. Gordon*, 409 F.3d 12, 22-23 (1st Cir. 2005) where the subject songs "d[id] not sound alike and would not sound alike to an ordinary listener," and only shared in part the common public domain melody in "Row, Row, Row Your Boat." *Id.* at 22 n6.

III.   **DEFENDANTS' COPYING OF CLONUS IS UNLAWFUL PURSUANT TO THIS CIRCUIT'S "ORDINARY OBSERVER" TEST AND, AT A MINUMUM, PRESENTS A TRIABLE ISSUE FOR THE JURY**

Unlawful appropriation, the remaining element of copyright infringement, exists if there is a substantial similarity between the two works under an "ordinary observer" test, *i.e.*, "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992), *citing Ideal Toy Corp. v. Fab-Lu, Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966). "The key to the ordinary observer test is therefore the similarities rather than the differences." *Novelty Textile*, 58 F.2d at 1093 n.4; *Gund v. Applause*, 809 F.Supp. 304, 308 (SDNY 1993); *Gund v. Russ Berrie*, 701 F.Supp.1013, 1021 (SDNY 1988).

For works which clearly incorporate both public domain and copyrightable elements, the courts have employed a "discerning ordinary observer" test whereby only the copyrightable elements in the subject works are compared. *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 765 (2d Cir. 1991). Where, the Plaintiffs' work is not clearly pervaded by public domain material, the "discerning" test is inappropriate. *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001), *citing Hamil Am., Inc. v. GFI*, 193 F.3d 92, 101-02 (2d Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000).

Defendants take the "discerning test" to an extreme by deconstructing the subject films and selectively attacking a minority of its elements as unoriginal or scenes a faire. The Second Circuit specifically *rejects* Defendants' dissection technique:

> "In applying [the 'discerning observer test,'] a court is not to dissect the works at issue into separate components and compare only the copyrightable elements. *Knitwaves[,Inc. v. Lollytags Ltd.*, 71 F.3d 996], 1003. To do so would be to take the "more discerning" test to an extreme, which would result in almost nothing being copyrightable because original works broken down into their composite parts would usually be little more than basic unprotectable elements like letters, colors and symbols. *Id.* This outcome -- affording no copyright protection to an original compilation of unprotectable elements -- would be contrary to the Supreme Court's holding in *Feist Publications*." *Boisson*, 273 F.3d at 272; *CBS Broad., Inc.*, 2003 U.S. Dist. LEXIS 20258, *13-14.

Because an <u>original compilation</u> of thoroughly unprotectable individual elements <u>is itself</u>

copyrightable, Defendants' approach of singling out some CLONUS elements as unprotectable does *not* refute their unlawful copying of CLONUS as a matter of law. *See Feist Publications v. Rural Tel. Service Co.*, 499 U.S. 340, 362, 111 S. Ct. 1282 (1991); *Knitwaves*, 71 F.3d at 1003-1004; *Sofitel, Inc. v. Dragon Med. and Scient. Commns, Inc.*, 118 F.3d 955, 964 (1997); *Hogan*, 48 F. Supp. 2d at 309; *Nihon Keizai Simbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70-71 (2d Cir. 1999) (focused not on whether facts were protected but whether the structure and organization of facts were substantially similar).[12]

Thus, whether applying the "ordinary observer test" or the "discerning ordinary observer test," the courts compare the ***total concept and feel*** of the contested works. *Hogan* at 309, *citing Knitwaves* at 1003; *Boisson*, 273 F.3d at 272; *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 748 (2d Cir. 1998). The determination requires an "examination of the works themselves." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir. 1986), *cert. denied,* 476 U.S. 1159 (1986); *see Nihon Keizai Simbun*, 166 F.3d at 70-71. "Even when two works are dissimilar in many respects, substantial similarity between them may still be found where their similarities are important in the overall context, whether qualitatively or quantitatively." *Hogan* at 309.[13] In essence, a court's "analysis of the 'total concept and feel' should be instructed by common sense." *Boisson*, 273 F.3d at 273; *Hamil*, 193 F.3d at 102 ("total concept and feel" guided by "good eyes and common sense").

In the Second Circuit a defendant is guilty of copyright infringement if it has "appropriated the fundamental essence or structure of Plaintiffs' work." *Arica*, 970 F.2d at 1073,

---

[12] Defendants' statement that "a properly instructed jury would be required to disregard non-copyrightable elements" (Mot., at 13, fn. 7) is thus erroneous under *Feist*, 499 U.S. at 362 (1991) and is not the law in this circuit. *See Boisson*, 273 F.3d at 272, *Knitwaves,* 71 F.3d at 1003.

[13] The Supreme Court and the Second Circuit have been especially vigilant in protecting the creative "heart" of a work from copying in alleged "fair use" cases. *See Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 564-65, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (magazine's unauthorized use of verbatim quotes from the heart of unpublished Ford memoirs); *Salinger v. Random House, Inc.*, 811 F.2d 90, 98-99 (2d Cir. 1987), *cert. denied,* 484 U.S. 890, 108 S. Ct. 213, 98 L. Ed. 2d 177 (1987) (use of virtually all of the most interesting passages from Plaintiffs' unpublished letters).

*quoting* 4-13 *Nimmer on Copyright* § 13.03[A][1] (defining "comprehensive non-literal similarity"); *see also, Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.* 996 F.2d 1366, 1372 (2d Cir. 1993) (describing "comprehensive non-literal" infringement as "global similarities in structure and sequence.").

An examination of CLONUS and THE ISLAND reveals that their total concept and feel is substantially, if not strikingly similar. The films are strikingly similar in their expression and treatment of themes, characters, plot, scenes, details, sequencing, pace, setting, dialogue, mood and tone. See *Comparative Matrix*. No reasonable juror would find otherwise.

Substantial similarity under the "ordinary observer" or "discerning ordinary observer" is usually a triable issue for the jury, *see Levine*, 735 F.Supp. at 96 (substantial similarity is normally a jury question) except for works with striking similarities, *Lipton*, 71 F.3d at 471 (*see* SJM at 9-10) or works with only very marginal similarities. (Cases cited in Mot. at 13-14).

The spontaneous reactions of actual lay observers and film critics alike to the striking similarities between CLONUS and THE ISLAND are persuasive in imagining a jury's reaction under the "ordinary observer" test. (Tob. Opp. Dec., ¶¶ 5-6, Exs. B,C). Such immediate, natural third party responses to THE ISLAND as a "remake," a "rip-off," "a clone" of CLONUS (in some cases by people who remember CLONUS from 26 years ago) are indeed relevant. (Will. Opp. Dec., Exs. B, C). "Certainly there can be no dispute that the spontaneous and immediate reactions of the ordinary observer are relevant evidence in determining the existence of copying." *MCA, Inc. v. Wilson*, 425 F. Supp. 443, 450 (SDNY 1976).

The following public comments are illustrative:

"'The Island,' is an un-credited rip-off of a low-budget 1979 flick, 'Parts: The Clonus Horror'…The similarities in dialogue and plot points are too many to list here. In a nutshell, both movies begin in a fitness paradise that turns out to be a meat factory for human clones, raised as spare parts for people in the real world, and living in a dream world while minded by guards in track suits. Then, The Island's screenwriters were lazy enough to steal, for its titular plot device, the cleverest and most unsettling notion of the original, the pie-in-the-sky myth that the keepers use to keep the clones docile. Instead of being told they're going to the slaughter, the clones are told they'll be going to a wonderland called 'America.' Here it's a paradise called 'The Island.'" *Media.ork.com* (Will. Opp. Dec., Ex. C).

"The first two thirds of the film are lifted almost directly from Robert Fiveson's CLONUS (aka PARTS: THE CLONUS HORROR), an almost forgotten film from the late seventies. It's all there: the isolated compound, the diets and exercise, the indoctrination, and the clones bred to be simple and compliant and not to question authority. The biggest difference is the budget and the scale." *IMDB.com* (Will. Opp. Dec. Ex. C).

---

"Unfortunately, whatever cautionary or entertainment value *The Island* may have must be considered stolen goods. The premise, plot and even specific plot points have all been essentially plagiarized from another film, one that Bay and writer Caspian Tredwell-Owen (presumably the real culprit) can confidently count on viewers flocking to multiplexes (and later to DVD stores) not having heard of, let alone seen…Fans of cult sci-fi may notice overt echoes of *Logan's Run, Gattaca* or *THX-1138*. The real source, though, is a 1979 sci-fi cheapie called *The Clonus Horror*. (Article proceeds to describe plot convergences in great detail)." *Catholicexchange.com* (Will. Opp. Dec., Ex. C).

---

"[T]he film truly is a remake of THE CLONUS HORROR, although there is no acknowledgement of this in the credits. Especially the first third is very close, presenting the audience with a phony "reality" that the characters accept and then providing glimpses behind the scenes that show us what is really happening." *Hollywoodgothic.com* (Will. Opp. Dec., Ex. B).

---

"The Island, although well done, enjoyable and thoroughly engrossing, is the most blatant example of 'Plagiarism is Cost Effective' that I've ever seen. There is absolutely NOTHING original in The Island. They apparently took an old 1979 movie called Clonus, jazzed it up with the best parts of Logan's Run, changed the names of the main characters and are now trying to pass it off as their own original work." *Amazon.com* (Will. Opp. Dec. Ex. C).

---

"[T]here are so many similarities between 'Island' and 'Clonus' - plot, circumstances, costumes, human-sized Ziplocs - that I think the creators of the old film could sue." *IMDB.com* (Will. Opp. Dec. Ex. C).

---

"More dedicated viewers will recognize that practically all of the key story points seen – a mysterious facility where clones unaware of their true purpose are raised for spare parts, one clone beginning to question his existence, a vague and secret romance with a fellow clone, the discovery of the truth, an escape to the real world and a meeting with the original and less-than-helpful version–come directly from a little-known 1978 B-movie title called 'Parts: The Clonus Horror.'" *eFilmcritic.com* (Will. Opp. Dec., Ex. C).

---

"Making matters worse, *The Island* is actually a remake of *The Clonus Horror*." *Moviehabit.com* (Will. Opp. Dec., Ex. B).

"Anyone who's seen the trailer or a sneak preview and has also seen the film <u>Clonus</u> (also known as <u>Parts: The Clonus Horror</u>) — a film which was shown on CBS, the Sci-Fi Channel, and even Mystery Science Theater 3000 — knows that the plots are way too similar to be mere coincidence." *Agonybooth.com* (Will. Opp. Dec., Ex. B).

"Anyone who's seen *Clonus* would immediately recognize *The Island* for what it is: a remake. The only real difference I could determine (besides Bay's inflated-budget action sequences) is that, in *Clonus*, the clones are created by self-serving politicians, whereas in The Island they are created by self-serving ultra ultra-rich." *Sci-fi.com/SF Weekly* (Will. Opp. Dec., Ex. B).

"I liked 'The Island' the first time... when it was called 'PARTS: The Clonus Horror.'" *Monitorduty.com* (Will. Opp. Dec., Ex. B).

Defendants' attempt to dismiss the public indignation regarding THE ISLAND as "internet chatter" flies in the face of the fact that seasoned film critics from well respected papers all remarked on THE ISLAND'S uncanny resemblance to CLONUS and labeled it a "remake." (Will. Opp. Dec., Ex. B).[14] Moreover, *IMDB.com*, the leading resource for credits in the film industry, listed THE ISLAND as a "remake" of CLONUS. (*Id.*, Owen Tr.166:11-167:12.).

Well prior to Defendants' release of THE ISLAND, the Writers Guild of America, west ("WGA"), in connection with their standard review of the film's writing credits, independently raised with DreamWorks, and separately with each of the writers, the issue of whether THE ISLAND was a remake of CLONUS (script registered with the WGA in 1973). (Will. Opp. Dec., Ex. E (Fehlker Dec.)). This occurred as a result of an assessment by the WGA's screen credits coordinator, Karen Fehlker, who was familiar with CLONUS. *Id.*

The immediate reaction to the two films as strikingly similar is particularly significant

---

[14] *E.g.*, The New York Times, Village Voice, Columbia Daily Tribune, Arizona Reporter, Seattle Post-Intelligencer, Premiere, Entertainment Weekly, MSNBC.com, TVguide.com, eFilmcritic.com, Science Fiction Weekly, VH1.com, Amazon.com, Scientific American.

when one considers that (i) THE ISLAND, with a $126 million budget, had vastly greater storytelling options (including elaborate special effects and sets) than did CLONUS ($257,000 budget); and (2) the differences in the era in which each film was produced (2004 vs. 1978) would naturally lead to very different films.  Notwithstanding these countervailing influences the two films are far more alike than many *acknowledged* Hollywood remakes.[15]

### A.     Plaintiffs' Case Rests On Protectible Expression, Not Generalized Ideas

The abundant and striking similarities between CLONUS and THE ISLAND are first and foremost similarities of expression and cannot be dismissed as mere unprotectable ideas.  Most striking is the way the films express their ideas in "similarities of treatment, details, scenes, events and characterization" and in their "total, concept and feel." *Hogan*, 48 F. Supp. 2d at 309; *see also Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 (9th Cir. 1983) (material issue of fact as to whether expression of Plaintiffs' ideas was copied).

Defendants improperly resort to the random isolation of similarities out of sequence or context in the films to abstract them as mere ideas.  Defendants' approach taken to its logical conclusion would result in no film being protectible.  While the abstraction of ideas inherent in cloning may or may not be protectible, it is clearly shown that the films share protectible *expressions* of plot, characters, themes, settings, tone, the sequencing and interplay of their elements and their total concept and feel. *Comparative Matrix*; *see Hogan*, 48 F. Supp. 2d at 308-309; *Lone Wolfe McQuade Assoc. v. CBS, Inc.*, 961 F. Supp. 587 (S.D.N.Y. 1997) (reasonable jury could find substantially similarity).[16]

---

[15]  See e.g., *The Hills Have Eyes* (2006) / *The Hills Have Eyes* (1977); *Guess Who* (2005) / *Guess Who's Coming To Dinner* (1967); *Dawn Of The Dead* (2004) / *Dawn Of The Dead* (1978); *I SPY* (2002) / *I SPY* television series (1965); *Gone In Sixty Seconds* (2000) / *Gone In 60 Seconds* (1974); *The Haunting* (1999) / *The Haunting of Hill House* (1963); *The Mummy* (1999) / *The Mummy* (1932); *You've Got Mail* (1998) / *The Shop Around The Corner* (1940); *Scarface* (1983) / *Scarface* (1932); *The Thing* (1982) / *The Thing From Another World* (1951)).

[16]  Defendants mis-rely on *Burroughs*, 683 F.2d 610, 624 (2d Cir. 1983) wherein the "[t]he plaintiffs recognize[d] that the overall stories are different" and "claimed only four specific similarities," which the Court noted were abstract ("the two incidents are similar only in that Jane shoots a gun, a level of abstraction that is beyond the protection of copyright").

Defendants argue that commonly repeated themes in a certain genre are unprotectable. However, CLONUS' expression of such themes in an unusual story told from the perspective of a clone who believes he is human *is* protectible. In fact, CLONUS (1979) was the first film to express science fiction themes in this way, quite before its time. Defendants heavily rely on a misleading portrayal of *The Resurrection of Zachary Wheeler* (1971) which concerns not clones, but barely seen Zombie-like creatures called "somas," which do not even speak. (Mot. at 11). The other films cited by Defendants (*Coma, Matrix, THX 1138, Logan's Run*) have little in common with CLONUS except one or two plot devices. Until THE ISLAND no other film has employed CLONUS' expression of themes in substantially the same way.

Defendants apply basic movie conventions – a sinister organization, a love interest or a controlled environment – to reach the fantastic conclusion that 102 undisputed similarities between the subject films in nearly the same sequence are unprotectable. *See Knitwaves,* 71 F.3d at 1003 (analogizing "there can be no originality in a painting because all colors of paint have been used somewhere in the past"). Defendants' abstractions and dissection are clearly intended to "miss the forest for the trees." Yet, such approach is antithetical to this Circuit's focus on the "total, concept and feel" of a work, which mandates examination of the works' in the context of their *overall* expression. *Knitwaves*, 71 F.3d at 1003.

The recent film, *Aeon Flux* (2005), is illustrative. *Aeon Flux is* a science fiction film about clones that believe they are humans. There is a "love interest," a "controlled environment" and a "sinister organization" in the film. Yet, *Aeon Flux* is nothing like CLONUS or THE ISLAND.[17] There are virtually no similarities in structure, sequence, pace, characters, themes or settings, as in CLONUS or THE ISLAND. See *Aeon Flux* DVD (Will. Opp. Dec., Ex. A).

*Total Recall* is another example of a science fiction film with a controlled repressive

---

[17] Everyone in *Aeon Flux* is a seventh generation clone, growing from embryos of those who had died because females could no longer have children. Cloning was the only way for the human race to survive after 95% of the earth's population died from a disease whose cure resulted in female infertility. (Will. Opp. Dec., Ex. A).

environment, a sinister organization, a hero who does not know his true identity and is driven to discover the truth; and there is a "love interest," rebellion against those in control and chase scenes. Yet, no "ordinary observer" in viewing *Total Recall* would find substantial similarities to CLONUS or THE ISLAND. See *Total Recall* DVD (Will. Opp. Dec., Ex. A).

　　　In selectively deconstructing the subject films, Defendants make one straw man argument after another. Yet, Plaintiffs need not prove that every single similarity, taken out of context, is wholly original. Indeed, the importance of viewing the films as a whole and Plaintiffs' *Comparative Matrix* is that it demonstrates beyond a doubt that the sequential patterns of expression in both works are substantially, if not strikingly similar. *See Comparative Matrix,* Nos. 1-3, 6, 10-12, 13-14, 19, 21, 30-32, 35, 37, 40-43, 46-47, 48, 59, 60-61, 62-69, 70, 72, 76-79, 81, 83, 90, 99-101. (Tob. Opp. Dec., Ex. E).

　　　Thus, it is not just that the escaping lead clone runs through an underground tunnel of corrugated metal, comes out on an arid plain hemmed by mountains, crosses a rickety fence with a dilapidated "Warning" sign until he reaches a rocky bluff overlooking the "real world;" it is that this sequence <u>and</u> the sequences that lead to this scene are substantially similar in both movies. People have been chased through hallways and industrial settings in many films. Yet, in how many has a clone who thought he was human been chased through such settings after discovering that a mythic paradise dominating his life ("America"/"The Island") is a lie, accidentally stumbling upon a large room where his brethren are warehoused for spare parts and, in his first glimpse of the real world, emerge on a desert ridge?

　　　Defendants make much of the fact that a "love interest" is a common place convention. True, it is difficult to recall a film in which love interests did not play a part; yet, how many films have a love interest between two childlike clones who live in an underground "utopia" in the Western United States and experience their burgeoning sexuality despite its repression by their makers to maintain complacency? *Aeon Flux*, concerns a "love interest" between two clones whose sexuality is not repressed and who were once married. (Will. Opp. Dec., Ex. A).

　　　These are but a few of the many examples how the elements of CLONUS even where

22

subject to isolated attack as cinematic conventions or scenes a faire are brought together to create a unique, protectible work, copied in THE ISLAND in virtually identical ways and sequences. The similarities of plot, characterization, sequencing, expression of themes and many other details are not only strikingly similar they are present together in <u>only</u> these two movies.

**B.      Defendants Copy Far More Than Mere Scenes A Faire**

Scenes a faire have been described as "scenes that necessarily result from the choice of a setting or situation," *Walker,* 784 F.2d at 50, and "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980); *see also Hogan* at 309.

The creative expression in CLONUS began with story elements that go far beyond and do not necessarily follow the topic of cloning.  The clones believe they are human, are kept in a childlike state and live in an ostensibly utopian, but tightly controlled spa-like colony where their lives are dominated by the indoctrinated myth that one day they will be chosen to live in a paradise called "America"/"The Island."  In reality, they are cloned and raised in top physical condition for rejection-free organs to be transplanted to their elite human sponsors when needed. From this original expression came many other choices involving further creative expression. These choices alone, and certainly in sequence, comprise protectible expression.

As evidenced by *Aeon Flux* (2005), *Blade Runner* (1978), *The Island of Dr. Moreau* (1986), *The Boys From Brazil* (1976) and *Star Wars* (1977), films involving cloning do not necessarily involve harvesting body parts.  A film about harvested clones does not necessarily take place in an underground desert facility in the Western United States – why not Manhattan, Space or the Arctic?  It does not necessarily follow that the clones be warehoused together in clear, plastic body bags – why not in clear glass tubes, ice, cryogenic freezers or a gelatinous tank.  A film about clones need not involve a "controlled environment" – why not a courtroom drama about clones in love who can not marry.  A clone population need not be controlled by the hope of an indoctrinated mythic paradise and could just as easily could be controlled by other means (e.g., drugs, hypnotism, punishment, physical restraints).  The choices are endless.

**C.    The Films' Plots, Characters, Settings, Themes, Dialogue, Details, Mood, Pace, Sequencing And Interplay Of Elements Are Substantially Similar.**

Defendants dubiously argue that only THE ISLAND is a fast-paced action adventure, whereas CLONUS involves a series of chases and its action climaxes in a deadly brawl, and the blowing up of a house, all within a miniscule budget.  Defendants argue that only CLONUS ends bleakly, whereas CLONUS ends with the lead's accomplished goal of exposing the truth through the media and THE ISLAND highlights the selfish and violent nature of modern America (besides the clones, only a mercenary survives).  Defendants argue that only CLONUS involves horror, whereas THE ISLAND involves many horrific scenes, including the appalling murder of a mother moments after she gives birth.

To avoid needless repetition, the Court is respectfully referred to Plaintiffs' *Comparative Matrix* (Tob. Opp. Dec., Ex. E) and to the discussion on pages 9-24 of Plaintiffs' brief in support of their motion for summary judgment, regarding the films' striking similarities of plot, characters, settings, themes, sequencing, and total concept and feel, which is hereby incorporated by this reference by consent of both parties.

**IV.    DEFENDANTS' PROFITS ARE AN ISSUE OF TRIABLE FACT**

Defendants erroneously argue that the Court should decide as a matter of law that they made no profits from THE ISLAND based on a thin, unsupported, untested declaration of Dreamworks' former CFO Steve Bertram, and a single distinguishable case from another district, *Rocking Chair Enters., L.L.C. v. Macerich SCG Ltd. P'Ship,* 407 F. Supp. 2d 1263 (W.D. Okla. 2005) (concerned *indirect* speculative profits from the short promotional partial use of a song).

The existence and amount of profits from copyright infringement is a classic triable issue of fact - an acute issue, given notorious "Studio accounting."  Even Bay, Dreamworks' director, does not believe their accounting.  (Bay Tr. 101:1-12).  At issue, for instance, is whether Defendants' accounting is consistent with GAAP; whether their deductions are accurate; whether their disbursements are justified; whether deducted amounts paid to Defendants or their principals are profit centers (e.g., overhead, production and distribution fees, interest and

redundant charges).  *See e.g. Hamil Am., Inc. v. GFI, Inc.*, 193 F.3d 92, 104-105, 107 (2d Cir. 1999) (whether overhead assisted infringement, and reasonableness of infringer's allocation are "question[s] of fact in all cases.").

Other than a conclusory top sheet from a purported internal "ultimate," Defendants fail to offer the complete document or any supporting documentation for its financial line items.  "Any doubts resulting from an infringer's failure to present adequate proof of its costs are resolved in favor of the copyright holder."  *In Design v. K-Mart Apparel Corp.*, 13 F.3d 559, 564 (2d Cir. 1994).   Defendant Warner Bros. controls foreign distribution of THE ISLAND which was highly profitable.  (Will. Opp. Dec., Ex. D)  Mr. Bertram attempts to counter this by declaring that Warner Bros. and Dreamworks share all costs and revenues, but again fails to provide any documentation.  Finally, Plaintiffs have a right to cross-examine Mr. Bertram and other witnesses from Defendants' accounting departments in open court and to present their forensic accounting expert to test Defendants' all too familiar claim of zero profits.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety.

DATED: May 31, 2006          LAW OFFICES OF MARC TOBEROFF, PLC

By _____
                    Marc Toberoff (MT 4862)

LAW OFFICES OF MARC TOBEROFF, PLC
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
(310)-246-3333

Attorneys for Plaintiffs Clonus Associates and
Robert Fiveson d.b.a. Fiveson Productions

25