**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
                            :

**CLONUS ASSOCIATES and ROBERT**   :
**S. FIVESON d.b.a. FIVESON**   :
**PRODUCTIONS,**   :
                            :

               **Plaintiffs,**   :
                            :

   - against -   :
                            :

**DREAMWORKS, LLC and WARNER**   :
**BROTHERS ENTERTAINMENT, INC.,**   :
                            :

              **Defendants.**   :
                            :
-------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/25/06

**OPINION AND ORDER**

**05 Civ. 7043 (SAS)**

This litigation involves two movies about secret facilities in which clones are unwittingly confined until their organs are harvested for the rich and powerful. Robert Fiveson alleges that defendants infringed the copyright of his 1979 movie, *Parts: The Clonus Horror* ("*Clonus*") through production and distribution of *The Island*, a movie released by defendants in July 2005. Following discovery, the parties filed cross-motions for summary judgment.[1] For the reasons described below, both motions are denied.

---

[1]     Defendants subsequently filed a motion in limine to have certain evidence precluded. The Court's ruling on that motion will be announced on the record during an in person conference.

## I. BACKGROUND

### A. Procedural History[2]

In 1978, Robert Fiveson produced and directed *Clonus*, which was based on a story and screenplay by Robert Sullivan.[3] The film was released in theaters in July 1979 and to VHS in the early 1980s.[4] It also aired on CBS and on a program called *Mystery Science Theater 3000*.[5] In March 2005, a DVD version of *Clonus* was released by Mondo Macabro, a distributor specializing in "cult film" reissues.[6]

In early 2004, DreamWorks purchased the screenplay for *The Island*, which had been written on "spec" by Caspian Tredwell-Owen.[7] DreamWorks subsequently brought in two writers, Alex Kurtzman and Roberto Orci, to re-work

---

[2]     The facts summarized in this section are undisputed.

[3]     *See* Statement of Undisputed Material Facts and Proposed Conclusions of Law ("Pl. 56.1") ¶¶ 1-3; Plaintiffs' Opposition to Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Pl. Opp. 56.1") ¶ 2.

[4]     *See* Pl. 56.1 ¶¶ 4-5; Defendants' Local Rule 56.1 Statement of Undisputed Material Facts in Support of Motion for Summary Judgment Dismissing Complaint ("Def. 56.1") ¶ 1; Defendants' Counterstatement to Plaintiffs' Statement Pursuant to Local Civil Rule 56.1 ("Def. Opp. 56.1") ¶ 5.

[5]     *See* Def. 56.1 ¶¶ 48, 50.

[6]     *See* Pl. Opp. 56.1 ¶¶ 63, 65.

[7]     *See* Def. Opp. 56.1 ¶ 10.

the screenplay, and hired Michael Bay to direct the film.[8] Filming began in 2004, the general domestic theatrical release occurred on July 22, 2005, and the DVD and videocassette versions became available on December 13, 2005.[9]

On August 8, 2005, plaintiffs filed a complaint alleging copyright infringement under the Copyright Act of 1976,[10] followed by a motion for a preliminary injunction on August 19.[11] This Court denied plaintiffs' motion for a preliminary injunction on October 27, 2005.[12] Following discovery, both parties filed motions for summary judgment.

## B.     The Movies

Because the determination of substantial similarity in a copyright case "requires a detailed examination of the works themselves," I have examined plaintiffs' movie *Clonus* and defendants' movie *The Island*.[13] A brief description of both works follows.

---

[8]        *See* Def. 56.1 ¶¶ 20, 27.

[9]        *See* Def. Opp. 56.1 ¶ 14.

[10]       *See* 17 U.S.C. § 101 *et seq.*

[11]       *See* 8/19/05 Order to Show Cause Why a Preliminary Injunction Should Not Issue.

[12]       *See Clonus Assocs. v. DreamWorks, LLC*, 417 F. Supp. 2d 248 (S.D.N.Y. 2005).

[13]       *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996).

## 1.   *Clonus*

*Clonus* is a movie about an isolated colony where clones are created to be organ donors for powerful people. These clones are not aware of their purpose or the fact that they are being held in captivity. Their lives are regimented to encourage physical health, and they are told that if they are fortunate enough to "qualify," they will go to "America," a happy and idyllic place.

The story is told from the point of view of a clone named Richard, who seems to be the first clone to question aspects of this existence. As Richard begins to raise doubts about life at Clonus, he is simultaneously falling in love with a female clone named Lena. Like Richard, Lena is a "control clone," meaning that her intellectual capacities have not been artificially diminished by her creators. Although Richard and Lena were never intended to interact and sexuality is discouraged at Clonus, the doctors allow them to develop a sexual relationship as an experiment, under video surveillance. While the romance between Richard and Lena progresses, the audience learns more about the nature of the colony. For example, when a clone named George reaches peak physical condition and is told that he has been chosen to go to America, he is instead killed and preserved in a plastic bag.

Doctors and guards at Clonus have the clones under constant

surveillance. Richard discovers that he is being watched, and soon afterward he is told that he will be leaving for America in two days. Deciding he wants to learn more, Richard breaks into the building where George was taken. Richard finds a videotape about the facility's cloning activities, evidence that he is a clone of someone named Professor Richard Knight, and a room full of dead clones including George.

Richard's unauthorized exploration is discovered, and he flees from Clonus, pursued by a gunman on a motorcycle. He escapes with only superficial wounds and ends up at the home of an elderly couple, Jake and Anna Noble, who agree to help him find his "original." Professor Richard Knight ("Rich"), an older version of Richard himself, turns out to be the brother of Senator Jeff Knight, whose presidential campaign speech was shown in the opening minutes of the movie without previous explanation of its relevance. Senator Jeff Knight is revealed as a beneficiary and proponent of the cloning program, who enrolled his brother Rich for the service without Rich's knowledge. A struggle erupts about whether they should help the clones or prevent the revelation of information about the Clonus facility. This dispute results in the deaths of Rich, Rich's son Rick, and the elderly couple who initially helped Richard.

Richard had returned to Clonus before this violence in the outside

world began, in hopes of rescuing Lena. Upon arrival, he discovers that she has been lobotomized, and the guards are awaiting Richard in her room. In the final moments of the movie, the deceased Richard is shown, preserved in his own plastic bag. Yet one positive outcome of Richard's adventure is revealed – there is a scene at a press conference that shows Senator Jeff Knight as a presidential candidate, paying lip service to human rights. The scene concludes with a question from a reporter who holds up a videotape and says, "Senator, could you please tell us about Clonus?"

## 2. *The Island*

The opening scenes of *The Island* are set in the Merrick Institute, a colony of unsuspecting clones who are raised for organ harvesting or to carry babies. The clones have been told that the earth is contaminated and that a place called "the island" is the only safe place left where one can enjoy nature; all clones are told they have a chance to go to this paradise if they "win the lottery." The male protagonist, "Lincoln Six Echo," suffers from unsettling nightmares, and seems to be the first clone to begin questioning various aspects of life within the Institute. Lincoln has a friend, "Mack," who turns out to be a non-clone who works as a mechanic at the Institute, and a love interest named "Jordan Two Delta," who is not permitted to touch Lincoln because clones are not supposed to be aware

of sexuality.

One evening, Jordan is chosen in the lottery, and later the same night Lincoln has another nightmare and goes to a part of the facility that he is not permitted to explore. Lincoln ends up infiltrating the medical facility, where he learns the true nature of the colony and rushes back to save Jordan before she "leaves for the island." The two have to fight guards as they escape from the Institute. Meanwhile, the audience sees the head of the Institute, Dr. Merrick, doing a presentation to wealthy prospective clients – Dr. Merrick assures them that the clones he is selling as insurance policies are raised in a persistent vegetative state. But soon after, Dr. Merrick has a more forthright discussion with a bounty hunter he hires to pursue Lincoln and Jordan. Dr. Merrick admits that he has been lying to his customers about the business, because organs failed when earlier clones were raised without consciousness.

Lincoln and Jordan find Mack and enlist his help to track down their "sponsors," but Mack is killed by the bounty hunters that arrive on the scene to try to stop the escaped clones. Lincoln and Jordan engage in a series of violent chase scenes with the bounty hunters and police, who are pursuing them at cross-purposes – the two clones are involved in a car crash, a street shoot-out, the strategic, violent release of an eighteen-wheel truck's payload, a chase via flying

bikes, and a suspension and fall from a seventy story building.

The next day, Lincoln and Jordan find Lincoln's physically identical sponsor, Tom Lincoln, who agrees to help them but instead reveals their location to the Merrick Institute. After a high-speed chase scene in Tom's car, Lincoln tricks a bounty hunter into shooting Tom instead of Lincoln. Meanwhile, Dr. Merrick has decided that Lincoln's entire generation of clones must be "recalled" because they exhibit too much curiosity. Lincoln and Jordan have discovered their sexuality together and are happy and safe for the moment in Tom Lincoln's house, but when they learn of this plan they decide to intervene. Jordan allows herself to be captured by the bounty hunters and Lincoln, pretending to be Tom, also returns to the Institute. They save the remaining clones, and Lincoln kills Dr. Merrick in a hand-to-hand battle. The last scene shows Lincoln and Jordan on a boat that had appeared in Lincoln's dreams, in a beautiful and isolated place.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[14] "An issue of fact is genuine 'if the evidence is such

---

[14]    Fed. R. Civ. P. 56(c).

that a jury could return a verdict for the nonmoving party."[15] A fact is material when it "might affect the outcome of the suit under the governing law."[16] The movant has the burden of demonstrating that no genuine issue of material fact exists.[17]

   In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does "'not rely on conclusory allegations or unsubstantiated speculation.'"[18] To do so, it must do more than show that there is a "'metaphysical doubt as to the material facts.'"[19] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[20]

---

[15] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). *Accord Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

[16] *Jeffreys*, 426 F.3d at 553 (quoting *Anderson*, 477 U.S. at 248).

[17] *See, e.g., Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[18] *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[19] *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[20] *See, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004).

## B. Copyright Infringement

To prevail on a claim of copyright infringement, a plaintiff must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."[21] A certificate of registration made before or within five years of publication of a work is prima facie evidence of the first element.[22] To satisfy the second element of an infringement claim, "a plaintiff must show both that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'"[23] Because direct evidence is seldom available to prove "actual copying," a plaintiff may fulfill this requirement with indirect evidence, "including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony."[24] "It is only after actual copying is established that one claiming infringement then proceeds to demonstrate that the copying was improper or unlawful by showing that the second

---

[21] *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

[22] *See* 17 U.S.C. § 410(c).

[23] *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).

[24] *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 139-40 (2d Cir. 1992) (quotation marks and citations omitted).

10-

work bears 'substantial similarity' to protected expression in the earlier work."[25]

## 1. Actual Copying

### a. Access

Access to a copyrighted work may be inferred from the fact that a work was widely disseminated at the time of copying.[26] Wide dissemination is established where "the allegedly infringed work has had considerable commercial success or is readily available on the market."[27] If the infringed work has not been widely disseminated, a plaintiff can prove access by showing "a particular chain of events or link by which the alleged infringer might have gained access to the work."[28] Finally, there are certain limited situations in which a plaintiff need not prove access at all, because the similarities between the two works are so "striking" that they alone serve "both to justify an inference of copying and to prove improper

---

[25] *Castle Rock Entm't*, 150 F.3d at 137 (quotations omitted).

[26] *See Boisson v. Banian, Ltd.,* 273 F.3d 262, 270 (2d Cir. 2001) (citations omitted).

[27] *Silberstein v. Fox Entm't Group, Inc.*, No. 02 Civ. 1131, 2004 WL 1620895, at *7 (S.D.N.Y. July 19, 2004).

[28] *Mowry v. Viacom Intern., Inc.*, No. 03 Civ. 3090, 2005 WL 1793773, at *4 (S.D.N.Y. July 29, 2005).

11.

appropriation."[29]

"Access means that an alleged infringer had a 'reasonable possibility' – not simply a 'bare possibility' – of hearing [or seeing] the prior work; access cannot be based on mere 'speculation or conjecture.'"[30]  In the Second Circuit, a plaintiff must generally prove that the creators themselves, and not only an affiliated corporation, had access to the work that was allegedly copied.[31]

### b.    Probative Similarity[32]

In determining whether two works are similar enough to prove actual copying, courts ask "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."[33]  The Second

---

[29]    *Arnstein v. Porter*, 154 F.2d 464, 468-69 (2d Cir. 1946). *Accord Jorgensen*, 351 F.3d at 56; *Repp v. Webber,* 132 F.3d 882, 889 (2d Cir. 1997).

[30]    *Jorgensen*, 351 F.3d at 51 (quoting *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988)).

[31]    *See id.* at 59 ("Bare corporate receipt of . . . [plaintiff's] work, without any allegation of a nexus between the recipients and the alleged infringers, is insufficient to raise a triable issue of access.").

[32]    The Second Circuit cautions that "'probative,' rather than 'substantial' similarity is the correct term in referring to the plaintiff's initial burden of proving actual copying by indirect evidence." *Castle Rock Entm't*, 150 F.3d at 137 (quotation marks and citations omitted).

[33]    *Warner Bros. v. American Broad. Cos.*, 654 F.2d 204, 208 (2d Cir. 1981) (citing *Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966)).

Circuit has noted that this is "a task generally performed after detailed examination of the works themselves."[34] A court must examine the alleged similarities "in such aspects as the total concept and feel, theme, characters, plot sequence, pace and setting."[35]

### c.    Independent Creation

Once a plaintiff establishes a prima facie case of actual copying using either direct or indirect evidence, a defendant may rebut the finding by proving independent creation of the alleged copy.[36] "In analyzing this affirmative defense, the fact-finder must be mindful that 'subconscious' or 'innocent' copying is still copying."[37]

The Second Circuit has held that the strength of a defendant's "independent creation" defense is "a question for the factfinder."[38] In so holding,

---

[34]    *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48-49 (2d Cir. 1986) (citing *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir. 1936)).

[35]    *Williams*, 84 F.3d at 588.

[36]    *See Repp*, 132 F.3d at 889.

[37]    *Id.*

[38]    *Id.* at 891 (citing 3 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* § 12.11[D]). *Accord Sandberg & Sikorski Corp. v. Andin Int'l*, 50 U.S.P.Q.2d 1699, 1701 (S.D.N.Y. 1999) ("[I]n order to decide whether [the independent creation] defense has merit, it will be necessary for the Court to hear the live (and disputed) testimony of Andin's jewelry designer, Aya Azrielant,

the Second Circuit cited *Nimmer on Copyright*, which further explains that:

> To negate copying, a defendant can allege independent creation. No matter how credible such a claim is, and even absent any contrary evidence, a court should not grant defendant summary judgment on that basis. For, in the absence of the ability to construct a time machine capable of peeking back into defendant's atelier, the law has devised proof of access plus probative similarity as surrogates to prove copying as a factual matter. To the extent that defendant denies that copying and maintains independent creation, a factual issue arises, which it is for trial to resolve.[39]

## C. Actionable Infringement

After establishing that copying has occurred, a court must examine

whether the "copying is quantitatively and qualitatively sufficient to support the

legal conclusion that infringement (actionable copying) has occurred."[40]  In

which forms the heart of that defense. Only by weighing demeanor evidence and having the full benefit of live cross-examination can the Court reliably assess Ms. Azrielant's credibility and determine whether Andin's claim of independent creation has merit.").

[39]     4 *Nimmer on Copyright* § 12.10[B]. *See also id.* § 12.11[D] ("In offering evidence of independent creation, it has been said that, whenever possible, defendant should produce as a witness the author whom defendant claims created his work, so that he may directly testify as to his sources and subject himself to cross-examination.").

[40]     *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997) ("At first glance, it might seem odd to pursue an inquiry as to 'substantial similarity' even after copying as a factual matter has been established. However, the superficial anomaly reflects only a lack of appreciation of the difference between factual copying and actionable copying. The former (probative similarity) requires only the fact that the infringing work copies something from

14

undertaking this analysis, courts should be aware that

> dissimilarity between some aspects of the works will not
> automatically relieve the infringer of liability, for 'no copier may
> defend the act of plagiarism by pointing out how much of the
> copy he has not pirated.' It is only when the similarities between
> the protected elements of plaintiff's work and the allegedly
> infringing work are of 'small import quantitatively or
> qualitatively' that the defendant will be found innocent of
> infringement.[41]

The quantitative component of substantial similarity "concerns the

amount of the copyrighted work that is copied, which must be more than 'de

minimis.'"[42] Thus, a plaintiff must establish that the similarities between the two

works amount to more than "random similarities" that "are of little importance in

the works."[43] Substantial similarity will be found if "'the ordinary observer, unless

he set out to detect the disparities, would be disposed to overlook them, and regard

---

the copyrighted work; the latter (substantial similarity) requires that the copying is
quantitatively and qualitatively sufficient to support the legal conclusion that
infringement (actionable copying) has occurred.").

[41]    *Williams,* 84 F.3d at 588 (quoting *Rogers v. Koons*, 960 F.2d 301,
308 (2d Cir. 1992)).

[42]    *Castle Rock Entm't,* 150 F.3d at 138 (quotation marks and citations
omitted).

[43]    *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 313 (S.D.N.Y. 1999)
(citing *Williams,* 84 F.3d at 590).

[the works'] aesthetic appeal as the same.'"[44] The qualitative component concerns

the copying of expression, rather than ideas, facts, works in the public domain, or

any other non-protectable elements."[45] In addition, "scenes a faire," which have

been described as "elements that follow naturally from a work's theme rather than

from an author's creativity," are not entitled to copyright protection.[46]

"Substantial similarity is customarily an extremely close question of

fact."[47] However, courts have granted summary judgment for defendants when

each similar element between two works was held non-protectable as a matter of

law.[48]

## III.  DISCUSSION

### A.  Valid Copyright

---

[44]     *Boisson*, 273 F.3d at 272 (quoting *Folio Impressions, Inc. v. Byer Cal.,* 937 F.2d 759, 765 (2d Cir. 1991)).

[45]     *Castle Rock Entm't*, 150 F.3d at 138.

[46]     *MyWebGrocer, LLC v. Hometown Info., Inc.*, 375 F.3d 190, 194 (2d Cir. 2004). *See generally Hogan*, 48 F. Supp. 2d at 309 (citing 3 *Nimmer on Copyright* § 13.03[B][4]). *See also Walker*, 784 F.2d at 50 (in a depiction of policemen in the South Bronx, "drunks, prostitutes, vermin and derelict cars" are scenes a faire); *Williams*, 84 F.3d at 589 (in a story about a dinosaur zoo, "electrified fences, automated tours, dinosaur nurseries, and uniformed workers" are scenes a faire).

[47]     *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980).

[48]     *See id.*

Plaintiffs have submitted a copy of the certificate of copyright

registration for *Clonus*, and defendants have not contested the ownership or

validity of this copyright.[49] Therefore, plaintiffs must only prove the second prong

of a copyright infringement claim – copying constituent elements of the work that

are original. Plaintiffs do not offer direct evidence of actual copying, so the

parties' arguments are focused on indirect evidence, related to access and

probative similarity.

**B. Access**

"Wide dissemination" is the key issue here.[50] Defendants argue that

"*Clonus's* distribution has been minuscule."[51] They point out that even plaintiffs'

expert witness had only "vaguely" heard of *Clonus* and had never seen it prior to

the litigation.[52] But plaintiffs assert that the movie has been easily accessible on

---

[49]     *See* United States Copyright Office Certificate of Registration, Ex. 1
to Complaint; Def. Opp. 56.1 ¶ 7.

[50]     The parties also dispute the existence of "direct link" evidence, but
plaintiffs acknowledge that this theory is less central. *See* Reply Memorandum of
Law in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Reply") at 8
("evidence of these 'links' is *icing on the cake*") (emphasis in original).

[51]     Memorandum of Law in Support of Defendant's Motion for Summary
Judgment ("Def. Mem.") at 9.

[52]     *Id.* at 9-10.

17-

the market since it was released in VHS format in the early 1980s.[53] Plaintiffs also note that *Clonus* was awarded a "Saturn" for "Best Low Budget Picture" on a televised awards ceremony of *The Academy of Science Fiction Fantasy and Horror*, and was featured in a common textbook titled *The Indie Producer's Handbook.*[54] The parties dispute the number of times that *Clonus* aired on Mystery Science Theater 3000 and on cable venues such as the Sci-Fi channel, Showtime, HBO, Spectrum, and USA.[55]

Given that a work only needs to be "readily available on the market" for a party to establish wide dissemination, plaintiffs have clearly raised a triable issue of fact as to access.[56] But on the evidence currently before the Court, a reasonable fact finder could conclude that Caspian Tredwell-Owen had only a "bare possibility" of seeing *Clonus* when he was working on *The Island's* script in England.[57] In sum, whether defendants had access to *Clonus* presents a disputed

---

[53]    *See* Pl. 56.1 ¶ 5; Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Mem.") at 10-11.

[54]    *See* Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp.") at 10-11.

[55]    *See* Def. 56.1 ¶¶ 50, 52; Pl. Reply at 10.

[56]    *Silberstein*, 2004 WL 1620895, at *7. *Accord* Def. Mem. at 9; Pl. Opp. at 11.

[57]    *Jorgensen*, 351 F.3d at 51.

issue of fact, and cannot be decided as a matter of law in favor of either plaintiffs or defendants.

## C.    Degree of Similarity

Given that there is a material issue of fact as to access, plaintiffs would have to prove striking similarity as a matter of law in order to be granted summary judgment. But reading the evidence in the light most favorable to defendants, it is impossible to conclude that the resemblance between the two movies is so overwhelming as to mandate such a finding. The degree of similarity between these movies is also an issue for the trier of fact.

I note that even if plaintiffs are able to establish actual copying through evidence of access plus probative similarity or through striking similarity, the jury will have to decide whether the similarities are qualitatively substantial, and therefore actionable. This will require differentiation between similarities that constitute original artistic expressions and those that flow from non-protectable ideas, from scenes a faire, or from conventions of science fiction and Hollywood films. These questions are also fraught with fact-based disputes.

## D.    Independent Creation

Defendants argue that they should be granted summary judgement because they can rebut any proof of copying with "uncontroverted evidence"

establishing independent creation of *The Island*.[58] But the Second Circuit's

decision in *Repp v. Webber* makes it clear that independent creation is a question

of fact, and should be reserved for the jury.[59]

### E. Damages

Finally, defendants urge the Court to decide as a matter of law that

because *The Island* has not been profitable, plaintiffs are not entitled to be

awarded profits under section 504(b) of Title 17 of the United States Code.[60]

Defendants cite only one authority in support of this argument – an opinion from

the Western District of Oklahoma in which the court granted summary judgment

as to indirect, speculative profits from the brief promotional use of a portion of

---

[58]  Def. Mem. at 2.

[59]  *See* 132 F.3d at 891.

[60]  Section 504(b) states:

> The copyright owner is entitled to recover the actual damages
> suffered by him or her as a result of the infringement, and any
> profits of the infringer that are attributable to the infringement
> and are not taken into account in computing the actual damages.
> In establishing the infringer's profits, the copyright owner is
> required to present proof only of the infringer's gross revenue,
> and the infringer is required to prove his or her deductible
> expenses and the elements of profit attributable to factors other
> than the copyrighted work.

17 U.S.C. § 504(b).

plaintiff's song.[61]

In this case, defendants' methods of calculating profit is highly
contested, as are the material facts that affect that calculation.[62] The only evidence
submitted by defendants to support the claim that *The Island* made zero profit is a
brief declaration from Dreamworks' former Chief Financial Officer, which is not
accompanied with supporting documentation. Plaintiffs list various disputed
issues of fact surrounding this claim, such as "whether Defendants' accounting is
consistent with [generally accepted accounting principles]; whether their
deductions are accurate; whether their disbursements are justified; [and] whether
deducted amounts paid to Defendants or their principals are profit centers."[63] This
issue is clearly not amenable to summary judgment.

---

[61] *See* Def. Mem. at 25 (citing *Rocking Chair Enters., LLC v. Macerich
SCG Ltd. P'ship*, 407 F. Supp. 2d 1263, 1271-74 (W.D. Okla. 2005)).

[62] *See, e.g.,* Deposition of Michael Bay, Director of *The Island*, Ex. C to
Declaration of Marc Toberoff, Esq., Counsel to Plaintiff, in Opposition to
Defendants' Motion for Summary Judgment, at 101 (Q: "Do you know what they
spent on advertising?"; A: "The way – the looks of it – Dreamworks, nothing."; Q:
"But do you have any idea what they spent?"; A: "I don't know. I think they're
lying to me, personally.").

[63] Pl. Opp. at 24-25.

21.

## IV. CONCLUSION

For the reasons set forth above, plaintiffs' and defendants' motions

for summary judgment are denied in their entirety. The Clerk of the Court is

directed to close these motions [Nos. 36 and 47 on the Docket Sheet]. A

conference is scheduled in this matter for September 18, 2006 at 4 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           August 25, 2006

## - Appearances -

### For Plaintiffs:

Marc Toberoff, Esq.
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars, Suite 1540
Los Angeles, California 90067
(310) 246-3333

Laurence Singer, Esq.
1717 K Street, Suite 600
Washington, DC 20036
(646) 327-8772

### For Defendants:

Stephen F. Huff, Esq.
Tom J. Ferber, Esq.
William L. Charron, Esq.
Colleen E. Parker, Esq.
Pryor Cashman Sherman & Flynn, LLP
410 Park Avenue
New York, New York 10022
(212) 421-4100

Louis P. Petrich, Esq.
Vincent Cox, Esq.
Leopold, Petrich & Smith
2049 Century Park East, Suite 3110
Los Angeles, California 90067
(310) 277-3333